Filed 3/8/21  In re L.F. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sutter)

----

|  |  |
|---|---|
| In re L.F. et al., Persons Coming Under the Juvenile Court Law. | C091985 |
| SUTTER COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>L.F.,<br><br>Defendant and Appellant. | (Super. Ct. No. DPSQ180092, DPSQ180093) |

Appellant, father of the minors C. and L., appeals from the juvenile court's order denying his petition for modification seeking in-person and telephonic visits between father and the minors.  (Welf. & Inst. Code, §§ 388, 395.)[1]  Appellant contends the

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

1

juvenile court abused its discretion in denying his petition with respect to his request for telephonic visits with L. Father does not raise any issue with respect to C. and, accordingly, we dismiss the appeal as to minor C. As to minor L. we find no merit in father's contention and affirm.

## I. BACKGROUND

Sutter County Department of Health and Human Services (the Department) filed section 300 petitions on behalf of minors L. and C., then 10 years of age, in January 2018, based on mother's neglect regarding their physical and mental health needs and physical abuse by the minors' stepfather. Both minors have mental health issues that need parental attention. The minors also reported that, in the past, father had exposed them to pornography and forced them to smoke marijuana. Father was reported to be homeless and had not provided the minors with any provisions for support. The minors did not maintain a relationship with father, had not seen him in "years," and his whereabouts were unknown.

The minors were detained, the court took jurisdiction and adjudged the minors dependent children of the court. The minors were ordered removed and mother was provided with reunification services. Father, who remained an alleged father and whose whereabouts remained unknown, was not provided services. Father's whereabouts remained unknown at the time of the September 2018 six-month review hearing. Mother had not participated in the reunification services or visited the minors, and the court ordered services terminated. Adoption was selected as the permanent plan.

As of January 17, 2019, father's whereabouts remained unknown, despite the due diligence of the Department. The section 366.26 hearing had been continued several times and was set to take place on February 28, 2019. However, on February 5, 2019, father contacted the Department and demanded to visit the minors immediately. Thereafter, he had repeatedly demanded the minors be immediately released to his custody. He reported he had not had any contact with the minors in over five years and

2

had just been notified by the maternal grandparents that the minors were in foster care. He was living in Spokane Valley, Washington.

In its section 366.26 hearing report, the Department reported that, due to their behavior issues, L. and C. had each had four different placements. They had been in their current, separate, placements since July 10, 2018. Prior to their current placements, the minors had exhibited some difficult, and at one point sexualized, behaviors that made it difficult to find suitable, positive placement for them together. They had been in trouble often for not following rules and grounded routinely for being dishonest and causing damage to their home. Their mental health treatment goals were to support each minor while providing strategies to reduce their negative behaviors, impulsivity, and defiance. Since being placed separately, the minors were controlling their maladaptive behaviors much more consistently. Both L. and C. individually related to the social worker that they feel that they do better apart, as they do not lead each other to misbehave and get into trouble.

Both minors' mental health and emotional status were reported to be "fragile." L. was continuing to struggle to stabilize in his current placement, while C. appeared to have settled in with support services in place. Both of the minors' caregivers appear to understand the minors' individual needs and were continuing to provide a nurturing environment while providing structure, stability, and accountability. The caregivers, however, needed additional time to consider if they were willing or able to adopt. The minors had been interviewed regarding their attitude toward placement and adoption but still needed time to adjust to the fact that they were not returning to mother's care. They did report, however, that they enjoy their current homes.

L. was receiving specialty mental health services through Uplift Family Services in Roseville, California. He was receiving weekly individualized counseling and weekly client and family support services in the home. He was developmentally on track but

struggling academically. His past medical issues of obesity, asthma, and excessive snoring had resolved.

C. was struggling to maintain a healthy weight and had recently and successfully weaned off his medication prescribed for nocturnal enuresis. He had also initially struggled with sleeping, but his current caregiver reported she had not noticed any sleep issues. His behavior and attendance in school were good but his grades were poor. He had received specialized mental health services, including in-home behavioral services, individual counseling, and working with a mental health rehabilitation specialist. He had a treatment plan that included reducing negative behaviors, impulsivity, and defiance. He had recently met his treatment goals and concluded his mental health services in January 2019.

Mother had not visited either minor since March 5, 2018. Her visitation was ordered terminated at the September 2018 review hearing. The minors had maintained a connection with the maternal grandparents and had visited each other every other week. The social worker noted that the minors appear to be less mature, and less responsive to redirection and behavior modification when they are around each other.

The adoption specialist concluded that any benefit to the minors of continuing the legal relationship with their birth parents would be outweighed by the benefit of legal permanence through adoption and that termination of parental rights would not be detrimental to the minors once a family was identified. The Department requested the court order a permanent plan of adoption for each minor, without terminating parental rights, and allow the Department additional time to complete assessments and work toward securing prospective adoptive parents for the minors.

Father appeared at the February 28, 2019 hearing where he requested to be found the minors' presumed father and requested visitation with the minors and services. The minors also appeared at the hearing and expressed that they would like supervised visits with father. Minors' counsel and the Department argued father needed to file a section

4

388 petition in order to obtain presumed father status or receive services. The juvenile court ordered the minors to remain in the permanent placement program and set a permanent plan review hearing for August 27, 2019. Having been advised that the Department had retained discretion to provide visits for mother and father, the court ordered no change to that previous order.

On March 11, 2019, father filed a section 388 petition. His petition requested he be declared the minors' presumed father, that the minors be placed with him, and the dependency dismissed. Alternatively, he requested he be provided services. A hearing was set for March 28, 2019.

The Department filed a response to father's petition "strongly oppos[ing]" the petition. Father had been awarded joint custody of the minors in 2014 with a specific visitation plan. The Department emphasized that, nonetheless, despite his positive relationship with the maternal grandparents who have always known the whereabouts of the minors, father had not seen the minors in approximately five years, had not inquired about them and had made no efforts to provide for them. Father also admitted to having struggled "over the years" with methamphetamine and alcohol use, but he stated he had not used anything except marijuana and "sometimes" alcohol in over six months. He submitted to a drug test on February 28, 2019, which came back positive for alcohol, THC, and amphetamines.

The Department had set up a two-hour supervised visit between father and the minors for March 4, 2019. Father was instructed on the visitation protocol, including that he was not to discuss the case or make promises to the minors. Father submitted to a drug test prior to the visit, as required, which came back positive for THC. Father quickly engaged the minors at the beginning of the visit, asking if they wanted to play "dice." L. asked for father's phone and did not attempt to participate in the game. C. unsuccessfully attempted to learn the game. Approximately 20 minutes into the visit, father said he needed to use the restroom. The social worker waited in the hallway and

5

reported father used the restroom for only 30 seconds and exited the restroom sniffling. After father returned to the visitation room, he sat on the couch with the minors and began whispering to them that he was going to do everything he could to get them back and they would " 'be back together soon.' " Father stopped talking when he saw the social worker was shaking his head. Although father had been told the visit was scheduled for two hours, he abruptly announced, only 55 minutes into the visit, " 'I'm gonna get going. I don't want to leave my ride waiting too long.' " Father then told the minors he was going back to Washington to get his things in order, probably would not be able to get back to Sutter County for about three months, and that he was going to do what he needed to get the minors. The minors looked confused and did not really respond to father's comments. They hugged goodbye and father left. Father did not make further contact with the Department.

After the visit, the social worker had asked the minors how they felt about the visit, and both minors said " 'it was good.' " When asked how they felt about the potential of spending more time with father, or maybe living with him again, C. was quick to respond that he did not want to live with father and wants to be adopted by his current caregiver. C. related that he would not mind talking on the phone to father, " 'or something,' " but did not want to move to Washington or live with father. L. was not as forthright but stated he did not think he wanted to live with father either. L. said he would be happy to FaceTime him "or something," but also thought he would rather stay in his current placement and be adopted. The minors expressed that it was strange to see father, that he looked much different than he used to, and that they had been confused over the past few years as to where he went and why he never reached out to them. They were just happy that he was alive and did not forget about them.

The Department reported that both minors were placed in homes that have expressed a willingness to provide permanency. On March 22, 2019, the social worker spoke to C. and asked if he would like to attend the hearing on father's petition. C. stated

6

he was not interested in attending and asked if father would be present.  The social worker advised C. that father should be present for the hearing and asked C. if he wanted to see father or possibly arrange a visit.  C. abruptly said, "No."  The social worker also spoke with the resource parents for L. and the resource parents reported that L. did not want to attend the hearing or see father.

Neither minor attended the hearing.  Minors' counsel represented to the court that the minors had been curious and had wanted to visit father, who they had not even recognized, but they did not want any visits at the present.  The juvenile court found father to be the minors' presumed father but otherwise denied his petition seeking placement and/or services.[2]

A review hearing took place on August 29, September 3, and September 12, 2019.  The Department requested visitation with parents be terminated as detrimental to the minors and that adoption remain the permanent goal.  Both minors had been in their current placements for over a year and both homes had expressed a willingness to provide permanency.  The minors had stated that they did not want contact with either parent.  Mother had never visited the minors after the disposition hearing in March 2018 (although C. had telephone contact with her in June 2019) and father had left after only half of his scheduled visit.  The Department stated that, in the past, when the minors have had visits or contact, the parents disappoint them and leave the minors feeling lost and abandoned.  The minors have appeared to take a "downward spiral" after the contact.

C. stated he likes where he is living and is interested in the idea of a guardianship with his current caregiver but is uncertain about the idea of adoption.  C. had been doing well in his placement until late June or early July, when he started engaging in some concerning risk-taking behaviors, including touching bare wires together while they were

---

[2]  Father appealed and we affirmed this order.  (*In re L.F.* (Apr. 28, 2020, C089239 [nonpub. opn.].)

plugged into the electrical outlet. C. was immediately triaged and assessed and a safety plan was implemented. He had a new treatment plan to include individual therapy, mental health rehabilitation services, school-based mental health services, and in-home behavioral support. C. was continuing to struggle academically and was receiving supportive learning services.

L. was reported to be doing well in his current placement and he stated he would like to be adopted by his resource parents. The family was still considering whether they were willing to commit to a plan of adoption, but they were willing to commit to a plan of guardianship. L. had made some progress academically and was able to maintain appropriate behaviors at school. He was receiving weekly individualized counseling in addition to weekly client and family support services in the home.

The minors did not attend the hearings, but their counsel represented to the court that they did not want to visit with father and counsel argued that visitation with father should be found detrimental to the minors. Father continued to request visitation with the minors, asking for visits twice a month. The juvenile court found visits between father (and mother) and the minors detrimental and continued the minors in a permanent plan of adoption. The matter was set for a section 366.26 hearing.

The section 366.26 hearing was continued several times and eventually took place on February 25, 2020. C. did not attend the hearing, but L. appeared telephonically. All parties, except father, requested the court order legal guardianship for C. Father's counsel stated father was still interested in placement of the minors, renewed his request for visitation, and said father wanted the minors to know that he loved them and wished the outcome of this case had been different. Father began crying in court. At this point, the social worker informed the court that L. wanted to make a couple of comments. The minor said his "first comment" was that he had wanted visits and it was C. who "apparently . . . made that choice." L. said he was never able to have a word in regarding whether he wanted visits with father. L. remarked that C. did not want to visit. L. stated

8

it had been four to six years that father had not been there for them and that C. "didn't really trust." L. recognized that father had come all the way from Washington to the court dates, saying, "that means he truly does want." Father was noted to be crying during L.'s comments to the court. Father's counsel suggested they start with some telephone calls. Minors' counsel noted that L. was "saying something different" and that he had previously not wanted to visit with father. The court directed minors' counsel to contact L. and C. and, if something had changed, counsel could choose to file a petition for modification regarding visitation. It was thereafter noted, for L.'s information, that father had moved to Northern California and had been coming to hearings from Northern California, not Washington. The court continued the minors in a permanent plan of adoption.

The Department filed a status report on April 23, 2020. Both minors, 13 years of age, were in homes that were willing to provide permanency and where they had been placed since July 2018. Both minors had been advised of their right to attend the hearing and L. had no interest in attending.

L. and his resource family had been referred to Koinonia Family Restoration Program, which help youth transition to permanency. The resource family was still undecided as to whether they were willing to adopt, rather than proceed with a plan of guardianship, but the Department was hopeful they would commit to adoption because it had determined L. would benefit from such a plan. Koinonia provides pre- and post-adoption and guardianship behavioral health services with a specialty focus on issues related to trauma and permanency for youth. The services were to be provided to L. and the resource family in their home. L. had also agreed to meet with a psychiatrist and was still receiving intensive mental health services.

C. had improved substantially in his academics and was reportedly focused and motivated to do well. He was participating in school-based counseling to encourage good behavior. He was also participating in individual therapy once a week, mental health

9

rehabilitation services, and receiving in-home behavioral support. He had also recently begun taking Zoloft. He had a close bond and trusting relationship with his caregiver but continued to state that he prefers a permanent plan of legal guardianship over adoption.

The Department recommended a permanent plan of legal guardianship be ordered for C., that C.'s current resource parents be granted legal guardianship, and the dependency as to C. be dismissed. The Department further recommended that L. remain in the permanent placement program with a plan of adoption, without terminating parental rights.

Neither minor attended the April 23, 2020 hearing. Minors' counsel contacted C., who did not want to be present and said he did not want to have any visits with father. C. was in favor of guardianship as his permanent plan, although they did not have the guardianship papers to permit finalization. Minors' counsel was unable to reach L. and had not confirmed L.'s wishes regarding attendance at the hearing or visitation with father. The court noted that L. had previously told the social worker he was not interested in attending the hearing.[3] Minors counsel remarked that, regardless of L.'s wishes regarding visitation, L. had previously had little contact with father and that visitation with father should not be ordered if the plan was adoption. Father requested visitation with both minors since C.'s guardianship could not be finalized that day and L.'s plan was adoption without terminating parental rights, since his resource family had not committed to adoption. Father specifically requested some telephone contact between father and L. Minors' counsel opposed any order reinstating visitation as contrary to the minors' best interests and procedurally inappropriate. Minors' counsel did not disagree that L. had "kind of indicated he wanted [visits]" on the phone at the February 2020 hearing, but counsel did not believe visits were in L.'s best interest.

---

[3] The court was subsequently informed that the Department had contacted L. that morning and L. said he did not want to appear for court.

The court continued the matter as to C. and ordered a plan of adoption for L., without termination of parental rights. The court directed the Department and minors' counsel to try to contact the minors further regarding whether they wanted visits with father. The court did not modify its previous order terminating parents' visitation as detrimental to the minors. Father appealed. A court order and letters of guardianship were later issued for C.

## II. DISCUSSION

Father contends the juvenile court abused its discretion in not permitting telephonic visits between himself and L. We reject his claim of error.

Initially, as a procedural matter, as alluded to by the court and minors' counsel at the hearing, modification to the order terminating visitation was not properly before the juvenile court at the April 23, 2020, hearing from which this appeal was taken. The juvenile court had previously entered an order finding visits with father detrimental to the minors on September 12, 2019, and visits were terminated. At that time, the court suggested counsel bring a petition for modification if circumstances warranted. No such petition was filed. Had such a petition been filed, the moving party would have had the burden to prove both changed circumstances *and* that a modification to order finding visitation detrimental was in L.'s best interest. (§ 388.) While the court had the authority to modify its earlier order (as long as the parties are provided with notice and an opportunity to be heard before modification is made), it was not obligated to reconsider its previous order. (§ 385; *Nickolas F. v. Superior Court* (2006) 144 Cal.App.4th 92, 116.) But even if we were to construe father's request for reinstatement of visitation as such a petition, he failed to meet his burden of proof.

Father's argument in favor of visitation is premised on L.'s February 25, 2020, comment to the court, which he characterizes as a "clear desire for visits and contact." This, presumably, is the alleged change in circumstances.

11

We would be remiss, however, if we did not note that the minors had been in their separate placements for eight months before their visit with father and remained in their separate placements throughout the period thereafter, when both minors said they did not want to visit father. Indeed, the minors only had monthly (sometimes more) visitation with each other, and the social worker met with each child, face-to-face, a minimum of once a month *in their homes*. Thus, L. would have had ample opportunity to express a desire to visit father to his resource family or to the social worker outside C.'s presence, if it was truly his wish. The juvenile court could reasonably conclude that L.'s statement in court was more a function of guilt, listening to father crying, than a true statement of his earlier inability to express his true wishes or a current wish to maintain contact with father. We further note that L. chose not to attend the subsequent April 23, 2020 hearing.

However, even assuming L.'s statement that he had wanted visits with father was genuine, and not simply the result of feeling guilty because father was crying in court, and also assuming L. had not changed his mind after the hearing, the decision to not reinstitute visitation was not an abuse of discretion.

As the facts amply reveal, these minors, who had been removed from parental custody for over two years, had struggled substantially with their physical health, mental health, academics, and behavior and struggled to adjust to the trauma to which they had been subjected by their parents' neglect. L. had come into the system as destructive, defiant, and aggressive. He was described as having a bad temper and made threats to harm his peers. He was in need of one-on-one time and a safe, structured, and loving home. After being placed in their current homes, both minors had been making significant progress in all areas of their development. But there was still progress that needed to be made.

The minors had repeated time and again that they want to remain in their current placements and their permanent plans do not include reunification with either parent. The minors had no substantial relationship with father and, indeed, said it was strange to

12

see him.  Although the minors had stated the visit with father was " 'good,' " it was not. Father had whispered inappropriate promises to the minors, abruptly ended the visit after less than half the allotted time out of concern for inconveniencing his "ride," and improperly told the minors he was going to regain custody of them, but then told them he would not be available to them for three months.

Although L. had finally begun to stabilize in his placement, he continued to face emotional challenges and was still receiving intensive mental health services.  The juvenile court could reasonably conclude that, despite the wishes of this emotionally fragile child, taking steps to forge a new relationship between the minor and father, who was a relative stranger, was not in L.'s best interest.

### III.  DISPOSITION

As to minor C. (Sutter County case No. DPSQ180093), the appeal is dismissed. As to minor L. (Sutter County case No. DPSQ180092), the orders of the juvenile court are affirmed.

/S/

_____

RENNER, J.

We concur:

/S/

_____

BLEASE, Acting P. J.

/S/

_____

KRAUSE, J.

13